## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **CHAD STEVENS,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 22-2142-JAR** |
| **ACADEMY LTD d/b/a ACADEMY SPORTS + OUTDOORS,** | |
| **Defendant.** | |

## MEMORANDUM AND ORDER

Plaintiff Chad Stevens brings this diversity action against his former employer, Academy Ltd. d/b/a Academy Sports + Outdoors ("Academy"), alleging a claim of retaliatory discharge under Kansas law.  Before the Court is Defendant's Motion for Summary Judgment (Doc. 50).  The motion is fully briefed and the Court is prepared to rule.  For the reasons explained more fully below, Defendant's motion is denied.

### I.      Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.[1]  In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[2]  "There is no genuine issue of material fact unless the evidence, construed in the light most favorable to the nonmoving party, is such that a reasonable jury could return a verdict for the non-moving party."[3]  A fact is "material" if, under

---

[1] Fed. R. Civ. P. 56(a); *see also Grynberg v. Total*, 538 F.3d 1336, 1346 (10th Cir. 2008).

[2] *City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[3] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

the applicable substantive law, it is "essential to the proper disposition of the claim."[4]  An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."[5]

The moving party initially must show the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[6]  Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[7]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[8]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[9]  To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript[,] or a specific exhibit incorporated therein."[10]  The non-moving party cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.[11]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"[12]

---

[4] *Wright ex rel. Trust Co. of Kan. v. Abbott Lab'ies, Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[5] *Thomas v. Metro. Life Ins. Co.*, 631 F.3d 1153, 1160 (10th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[6] *Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)).

[7] *Anderson*, 477 U.S. at 256.

[8] *Id.*

[9] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 671).

[10] *Adams v. Am. Guar. & Liab. Ins. Co.,* 233 F.3d 1242, 1246 (10th Cir. 2000).

[11] *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (citation omitted).

[12] *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

II.     **Uncontroverted Facts**

  The following material facts are uncontroverted, stipulated to, or viewed in the light most favorable to Plaintiff as the nonmoving party.

  Defendant's Telephonic Accident and Injury Reporting Policy ("Policy") provides that when a team member is injured at work, that person should promptly report the injury to the team member's supervisor or another member of management.  Management is then required to immediately report the injury to Defendant's third-party claims administrator.  During the relevant timeframe, Sedgwick was Defendant's claims administrator.  The Policy further provides that if medical treatment is required "for a work-related accident, injury or illness, a supervisor or a member of management should access the applicable medical forms via Academy's intranet, The Spot."[13]  One of these forms is the "Authorization for Examination or Treatment Form," which states that "TEAM MEMBERS RECEIVING MEDICAL TREATMENT FOR A WORK-RELATED INJURY OR ILLNESS ARE <u>REQUIRED</u> TO HAVE SUBSTANCE ABUSE TESTING COMPLETED."[14]  The injured party is required to "[p]rovide a supervisor or member of management with a current work status report following all medical appointments."[15]  Defendant also has a Substance Abuse Policy, which provides that a drug screen is required for a work-related "accident," and "may" be required for a work-related "injury."[16]

  Plaintiff began working for Defendant on July 13, 2020, as a full-time Outdoor Enthusiast.  On July 24, 2021, Plaintiff was mopping an area outside the gun bar because floor

---

[13] Doc. 51-5 at 2.

[14] Doc. 51-6 at 2.

[15] Doc. 51-5 at 3.

[16] Doc. 57-3 at 1.

sealant had leaked in the area.  He slipped while mopping and fell backwards, using his left hand

to brace himself, and injured his shoulder.  After the fall, Plaintiff told Store Managers Luke

McClain and Anthony Hernandez what happened.  Plaintiff discussed his shoulder injury with

Hernandez, and told him he thought he needed medical attention.  Plaintiff cannot recall how

McClain responded, but Hernandez told Plaintiff that they needed to complete an incident report,

but he did not have time so they would call it in later.  When Plaintiff reported his injury on July

24, neither McClain nor Hernandez instructed him to submit to a drug screening.

During the next month, Plaintiff repeatedly sought direction from management about the

status of his incident report for the shoulder injury.  Plaintiff asked McClain about the incident

report more than 20 times between July 24 and August 27.  Each time, McClain told him the

report had not been completed.  Plaintiff asked Hernandez daily about how to follow the

company's policies and procedures for reporting his injury.  Hernandez continued to respond that

he was busy, but eventually, by mid-August, told Plaintiff that he needed to complete an incident

report with Jessica Maier, who was a department manager.  After that, Plaintiff estimates he

asked Maier about the incident report 15–20 times.  Maier told Plaintiff she either did not have

time or referred Plaintiff to Hernandez or McClain.  Around this time, Plaintiff also asked Store

Director Raven Tatum about 10 times whether she knew if Hernandez had completed the

incident report.  Tatum responded that she did not know and referred Plaintiff to Hernandez.

Plaintiff never told these managers that he did not need medical treatment.

On the many occasions during this period when Plaintiff asked about completing an

incident report, none of his managers mentioned a drug screen or directed him to submit to one.

On August 23, 2021, Plaintiff emailed Regional HR Manager Rebecca Allen, to "follow up on

[his] incident report," because he had not heard anything back yet.[17]  Allen did not see this email because it went to her spam folder.

Plaintiff reinjured his shoulder on August 27, 2021, when he was stocking ammunition. He tweaked his shoulder and felt spasms when he moved the ammunition from the cart to the shelves.  When Hernandez arrived to work a few hours later, Plaintiff told him what happened and that he was in a lot of pain.  Plaintiff relayed that he was concerned because nothing had been done about his original injury.  He was concerned that he had worsened the original injury and might need surgery.  Hernandez asked Plaintiff if he could stay until the closing team member arrived in the next hour, and Plaintiff agreed.  Plaintiff was scheduled to work the next two days, August 28 and 29, but Hernandez told Plaintiff to take the weekend off and that he should stay home until Maier called him about the incident report.  Hernandez did not direct Plaintiff to submit to a drug screen.

On August 29, 2021, at 9:26 a.m., Plaintiff received a voicemail from the store but did not return the call.[18]  Later that day, at 5:45 p.m., Plaintiff sent an email to Allen stating that no one had created an incident report for his original injury and now he had reinjured his shoulder. He stated that his manager told him he would have his department manager make a report and call him with information, but that he had still not heard anything.  Plaintiff asked for Allen's

---

[17] Doc. 51-10 at 2.

[18] Plaintiff's foundation objections to statements of fact based on the AT&T call logs for Plaintiff's cell phone are overruled and denied.  Summary judgment evidence need not be "submitted 'in a form that would be admissible at trial.'"  *Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016) (quoting *Trevizo v. Adams*, 455 F.3d 1155, 1160 (10th Cir. 2006)).  "The requirement is that the party submitting the evidence show that it will be possible to put the information, the substance or content of the evidence, into an admissible form."  *Id.* (citations omitted).  Under Fed. R. Evid. 602, evidence must be excluded that is not based on the witness's personal knowledge.  Here, Defendant submits evidence obtained through a subpoena of Plaintiff's phone records.  In response to Plaintiff's foundation objection, it submits with the reply the declaration of counsel Jeannie M. Deveney.  The Deveney Declaration sets forth details about Plaintiff's phone number and the subpoena, attaches the records declaration and subpoena to AT&T, and the full call log record.  Doc. 61-1.  Defendant has therefore met its burden of showing that the evidence can be presented at trial in an admissible form through a witness with personal knowledge.

help so he "can get back to work."[19]  Allen responded on August 30, at 11:33 a.m. that Plaintiff's

original message went to her junk folder, but that she was happy to help and would reach out

within the next 24 hours.  Allen then contacted Edith Curry, the District Human Resources

Manager responsible for the Olathe store, to investigate the situation.  Curry, in turn, contacted

the store managers to investigate.[20]

On August 30, 2021, at 4:46 p.m., Maier sent Curry an email:

> Chad came to me a couple of weeks ago, stating he fell while
> mopping the floor by the gun bar.  I asked if he was ok and said we
> need to call it in.  He told me he did not want me to call it in, he
> was fine.  I have not heard anything about it again from him.
> Saturday when I got in, I was told he was a no call no show.
> Sunday he also did a no call no show.  I called and left a message
> to see what was going on.  Anthony came in and I told him about
> Chad.  Anthony told me that he was complaining about how he
> hurt his shoulder when he fell and offered to call it in so he could
> leave and go to the dr.  He told Anthony no he was not going to do
> it.  Today, I found out from a team member that Chad texted him.
> The text said that we do not care about him and that he was not
> corning back to work until we call it in and get a report number.
> He still has not called the store or answered my phone calls.  What
> is the best way to handle this?[21]

Curry responded a few minutes later:

> Anytime a team member claims injury we should call it in,
> regardless if they want to or not.  It's a liability for us not to.
> Please call it in immediately and let him know you need details so

---

[19] Doc. 51-13 at 5.

[20] Plaintiff's objections to Allen's and Curry's declarations as self-serving and conclusory are overruled and denied.  As the Tenth Circuit has explained, "virtually any party's testimony can be considered 'self-serving,' and self-serving testimony is competent to oppose summary judgment."  *Greer v. City of Wichita*, 943 F.3d 1320, 1325 (10th Cir. 2019) (citing *Sanchez v. Vilsack*, 695 F.3d 1174, 1180 n.4 (10th Cir. 2012)).  A declaration is competent summary judgment evidence if it "is based upon personal knowledge and sets forth facts that would be admissible in evidence."  *Janny v. Gamez*, 8 F.4th 883, 900 (10th Cir. 2021) (quoting *Speidell v. United States ex rel. IRS*, 978 F.3d 731, 740 (10th Cir. 2020)).  Plaintiff offers no argument as to why or how the declarations are not based on personal knowledge.  The Court has reviewed the declarations and finds that the statements therein satisfy the personal knowledge requirement because they relay first-hand experiences and impressions.

[21] Doc. 51-15 at 6.

that you can.  Time, date, location etc.  I would also try to view
cctv to see if it's on video.[22]

Maier reported Plaintiff's July 24 injury to Sedgwick soon after this email, at 5:55 p.m. on

August 30.

Also on August 30, Maier drafted a "Warning" for Plaintiff in which she claimed that

Plaintiff had a "no call, no show" for August 29 and 30.  It states that if Plaintiff is late or tardy

again, he will be terminated.  However, Plaintiff was not scheduled to work on August 30.

The next morning, Curry forwarded to Academy Claims Administrator Jennifer McNeil

the claim information.  McNeil told Allen that she contacted Plaintiff and instructed him to pick

up the paperwork he needed from the store, and that he needed to get a drug screen in connection

with his medical treatment.[23]  At 9:02 a.m. on August 31, 2021, McNeil emailed Curry and

Tatum, stating: "Chad will be coming into the store today around 11a to retrieve paperwork to go

see doctor and take drug screen.  Please have the paperwork available and also inform him to

return to the store once done with work status form."[24]

Later on August 31, Plaintiff went to the store, where he picked up paperwork and spoke

to McClain.  Plaintiff recorded his conversation with McClain on his phone.  In the recording,

McClain explains that the paperwork should contain a preauthorization, prescription information,

a work release, and information about physical therapy.  He advises Plaintiff about two different

places he could go to "get looked at."[25]  According to Plaintiff, he only received one piece of

paper with a list of two providers, and McClain wrote a number on the page.  McClain did not

---

[22] *Id.* at 5.

[23] Plaintiff's foundation objection based on the phone records is overruled and denied as described above.
Plaintiff's hearsay objection is overruled and denied because McNeil's statement to Allen is not being offered to
prove the truth of the matter asserted, but instead to show what information had been provided to Allen.

[24] *Id.* at 4.

[25] Doc. 53, Ex. 19.

instruct Plaintiff to submit to a drug test.  Plaintiff then went to Olathe Medical Center for

treatment that afternoon and had an x-ray.  At 8:46 p.m., Tatum called him.  According to

Plaintiff:

> She called me when I was leaving the hospital, which was five
> minutes before the store closed, and she was very rude.  Yelling at
> me, cursing, saying I went to the wrong place, that I was supposed
> to go take a drug test, that again I wasn't supposed to go to Olathe
> Med, that I needed to have the—bring the paperwork back in
> which I told her that they were closing in five minutes.  I was just
> walking out of the hospital and if she wanted I could bring it by
> even though they're going to be closed and she had said just bring
> it back then in the morning, but the entire conversation she was
> screaming, cursing, being very rude and was like, well, we've been
> on the phone for five minutes.  You could've been here. . . .[26]

Plaintiff left voicemails for Allen at 10:15 p.m. and 10:21 p.m. on August 31, reporting what had

transpired with his injury, the failure to complete a prompt incident report, his visit to the

hospital, and the calls he had received that day from "someone in work comp" and Tatum,

including that he was told he needed to get a drug test.[27]

The next morning, September 1, 2021, Allen listened to Plaintiff's voicemails from the

night before and contacted McNeil and Curry to better understand what happened.  Allen was

told that McNeil instructed Plaintiff to pick up paperwork from the store, take a drug test, seek

medical treatment, and then return the paperwork to the store after his appointment.  Curry told

Allen that Plaintiff had not taken the drug test or returned the paperwork as directed.[28]  Allen

called Plaintiff at 10:33 a.m. that morning and they had a 21-minute conversation, which

---

[26] Doc. 51-1 at 150:13–151:2.

[27] Doc. 53, Exs. 18, 23.  Plaintiff's hearsay objection is overruled and denied.  Plaintiff's statement in the voicemail is admissible as a statement against interest.  Fed. R. Evid. 801(d)(2)(A).  And McNeil's statement to Plaintiff is not being offered for the truth of the matter asserted, but to demonstrate Plaintiff's knowledge.

[28] Plaintiff's hearsay objection is overruled and denied because Defendant does not offer this evidence for the truth of the matter asserted, but instead, to show Allen's understanding of the facts when she later provided Plaintiff with a deadline to take a drug test.

included at least the mention of a drug test.  Allen then told McNeil about her conversation with Plaintiff.[29]

At 11:48 a.m. on September 1, Tatum sent an email to McNeil and Curry stating: "Good morning, Chad was sent out yesterday and asked to return to the store when he got done at the Dr.  He never came back last night nor this morning with the work status form[.]  Is there anything I need to do?"[30]  McNeil called Plaintiff and spoke to him for more than 15 minutes at 12:39 p.m.  At 3:15 p.m., McNeil emailed Tatum, and copied Curry, Maier, and Allen:

> Hello All,
>
> I spoke with Chad around 12:50p and I informed him that he was to return to the store once finished with medical provider yesterday and he said that once he was done the store was about to close in 10 minutes.  I then informed him that he should've taken the paperwork to [the] store this morning.  His response was he was waiting on the direction of HR.  I told him he had my permission to do so as he was holding up his process for further treatment and that Sedgwick was waiting on it as well.  I asked when he could do that and he said it would at least take him 3 hours to get himself ready and drive there.
> SD and Ops—Did Chad bring paperwork into store as of yet?"[31]

Tatum responded soon after that Plaintiff had not returned any paperwork yet, and McNeil forwarded Tatum's response to Allen and Curry at 3:52 p.m., stating that Plaintiff was being "non-compliant," and asking if they had talked to him.[32]

At about 4:00 p.m., Plaintiff went to the store and gave Hernandez a medical release form indicating he should remain off work for two to three days and providing lifting restrictions for

---

[29] Plaintiff's hearsay objection is overruled and denied because Allen's statement about what *she* told McNeil is not, by definition, hearsay. *See* Fed. R. Evid. 801(a)–(c).  It is also not conclusory and self-serving simply because it is contrary to Plaintiff's theory of the case.  Allen clearly has personal knowledge of what she told a third party, which is sufficient for this to be admissible.

[30] Doc. 51-15 at 4.

[31] *Id.* at 3–4.

[32] *Id.* at 3.

one week.  Plaintiff spoke to Hernandez and Maier and recorded the conversation on his phone.

Neither manager told him that the paperwork was deficient.  But during this conversation,

Plaintiff admits that Tatum told him he needed to take a drug test and asks what it had to do with

his injury.  Maier tells Plaintiff that a drug test is required by law because he injured himself

while on the job.  Neither Hernandez nor Maier provides him with instructions on how or where

to obtain a drug test.

At 8:24 p.m., Maier sent the following email to McNeil, copying Curry, Allen, and

Tatum:

> Yes Chad came in about 4pm today.  He went to Olathe Medical
> Center.  He brought in the release form.  He did not go and have
> the drug screen done.  I do not know why, he spoke to Anthony
> about it.  Farah Escaloni from claims called me.  She wanted me to
> file an additional claim.  Chad stated he hurt himself on 8/27/21
> while stocking ammo on the shelf.  I was unaware of this, so I
> pulled the CCTV footage for the time the incident happened for
> claims.  The time he was stocking ammo was between 10:16am
> and 10:30am.  Raven was the MOD at the time, Chad did not
> inform her.  The new claim number is 4a2109782930001.[33]

On September 2, 2021, at 1:45 p.m., McNeil tried to call Plaintiff and left a voicemail.  A

few minutes later, she sent an email to Curry asking what to do if Plaintiff refuses or keeps

giving excuses for getting a drug screen; Curry forwarded this email to Allen, asking for

guidance.  Allen and Curry decided to give Plaintiff until noon the following day to complete the

drug screen.  Allen called Plaintiff that afternoon and left a voicemail informing him that he had

until noon the following day (September 3, 2021) to complete a drug screen.[34]  Plaintiff denies

---

[33] Doc. 51-27 at 2.

[34] Plaintiff's foundation and best evidence rule objections to the AT&T call records are overruled and denied as already explained.  In addition to the call records, Defendant submits Allen's declaration about what she stated in the voicemail.  Allen has personal knowledge about what she stated in the voicemail, so the foundation objection is overruled and denied.  Plaintiff's relevance objection is also overruled and denied, as this fact is highly probative of whether Plaintiff had knowledge of the drug screen requirement and deadline, which was the basis of Defendant's decision to terminate him.

receiving this voicemail.  Allen then emailed Curry and told her she left Plaintiff a voicemail with the September 3 at noon deadline, and told her they would move forward with next steps if they did not hear from him by noon the next day.

On the morning of September 3, 2021, Curry sent a text message to Tatum, telling her that Plaintiff had until noon that day to complete the drug test and told Tatum that Allen communicated that deadline to Plaintiff.[35]  At 1:10 p.m. that day, Maier called Plaintiff and asked where he was, telling him he was supposed to have the drug screen turned in by noon. Plaintiff told Maier that he did not know what she was talking about, and that he did not know anything about a drug test.  He asked Maier where he should go, and Maier said to "just go to the other place since the first place was wrong."[36]

Plaintiff submitted to a drug screen that afternoon at Concentra, as Maier directed.  He presented the drug screen results to her at the Academy store at approximately 5:00 p.m. Plaintiff recorded the meeting on his phone.  When Plaintiff gave her the paperwork, Maier immediately tells him: "So as of today, you are no longer with us."[37]  Hernandez was present during this meeting and admits that Maier should have gotten the incident report done sooner and states that he "also was at fault for not doing it myself as the manager on duty."[38]

Plaintiff was terminated effective September 3, 2021.  In the termination report that Maier filled out, the reason for termination is: "Not following the procedure for work related

---

[35] Plaintiff's hearsay objection is overruled and denied.  Allen's communication with Plaintiff relayed in this voicemail is not being offered for the truth of the matter asserted.  The foundation objection is also overruled and denied because Curry's declaration provides the foundation for these text messages.  Doc. 51-14 ¶ 8.

[36] Doc. 51-1 at 163:17–24.

[37] Doc. 53, Ex. 28.

[38] Doc. 53, Ex. 29.

injuries.  Did not get a drug screen done."[39]   The results of Plaintiff's drug screen were negative for illegal substances and alcohol.  Plaintiff ultimately required additional medical treatment for a rotator cuff tear and labral tear on his left shoulder that required surgery.

## III.   Discussion

Plaintiff brings one claim in this matter for retaliatory discharge under Kansas law, alleging that Defendant terminated him in retaliation for his work-related injury.  Kansas law prohibits employers from firing an employee for filing a workers' compensation claim or for being absent because of work-related injuries.[40]   Retaliatory discharge claims are analyzed under the *McDonnell Douglas* burden-shifting framework.[41]   Under *McDonnell Douglas*, plaintiff initially bears the burden of production to establish a prima facie case of discrimination or retaliation.[42]   The burden of establishing the prima facie case is "not onerous."[43]   If plaintiff establishes a prima facie case, the burden shifts to defendant to articulate a facially nonretaliatory reason for its actions.[44]   If defendant articulates a legitimate nonretaliatory reason, the burden shifts back to plaintiff to present evidence from which a jury might conclude that defendant's proffered reason is pretextual, that is, "unworthy of belief."[45]

Under Kansas law, the plaintiff bears the burden of establishing a retaliatory discharge claim "by a preponderance of the evidence, but the evidence must be clear and convincing in

---

[39] Doc. 57-15 at 2.

[40] *Ortega v. IBP, Inc.*, 874 P.2d 1188, 1191 (Kan. 1994).

[41] *Rebarchek v. Farmers Co-op. Elevator & Mercantile Ass'n*, 35 P.3d 892, 898–99 (Kan. 2001).

[42] *McDonnell Douglas*, 411 U.S. at 802.

[43] *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

[44] *Id.*; *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1113 (10th Cir. 2007).

[45] *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1165 (10th Cir. 1998) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir. 1995)).

nature."[46]  The Kansas Supreme Court, however, has also held that a plaintiff "need not meet the clear and convincing standard at the summary judgment stage of the proceedings."[47]  With respect to the applicable standard of proof in federal court, a plaintiff need not "establish the elements of [the] prima facie case by clear and convincing evidence.  The clear and convincing evidence standard only applies once the burden shifts back to Plaintiff to demonstrate that the employer's proffered reasons for termination are pretextual."[48]

### A.    Prima Facie Case

The elements of a prima facie case of retaliatory discharge under Kansas law are: (1) the employee filed a claim for workers' compensation benefits or sustained a work-related injury for which the employee could assert a future claim for such benefits; (2) the employer had knowledge of the employee's compensation claim or the fact that the employee sustained a work-related injury for which they could file a future claim for benefits; (3) the employer terminated the employee's employment; and (4) a causal connection exists between the protected activity or injury and the termination.[49]

Defendant does not dispute that Plaintiff meets the first, second, and third elements of the prima facie case.  However, Defendant disputes that a causal connection exists between Plaintiff's work-related injury and his termination.  Defendant asserts that Plaintiff's termination was caused by his failure to timely submit to a drug test by noon on September 3, 2021.  "Proximity in time between the claim and discharge is a typical beginning point for proof of a

---

[46] *Ortega*, 874 P.2d at 1198.

[47] *Rebarchek*, 35 P.3d at 898.

[48] *Eckman v. Superior Indus. Int'l, Inc.*, No. 05-2318-DJW, 2007 WL 1959199, at *6 (D. Kan. July 2, 2007) (footnotes omitted) (citing *Foster v. AlliedSignal, Inc.*, 293 F.3d 1187, 1195 (10th Cir. 2002)), *aff'd*, 271 F. App'x 782 (10th Cir. 2008).

[49] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

causal connection."[50]  The Kansas Supreme Court follows the Tenth Circuit's lead in holding that for retaliatory discharge claims, "unless the employer's adverse action is closely connected in time to the protected conduct, the claimant will need to produce additional evidence in order to show a causal connection."[51]  Here, it is uncontroverted that Maier first reported Plaintiff's two workplace injuries to Sedgwick on August 30 and September 1, 2021.  He was terminated a few days later on September 3, 2021.  This extremely close temporal proximity is sufficient proof to create a genuine issue of material fact regarding causation under Kansas law.[52]

### B.      Facially Nonretaliatory Reason for Termination

Because Plaintiff has satisfied his non-onerous burden of demonstrating a prima facie case of retaliatory discharge, Defendant must proffer a legitimate, nonretaliatory reason for Plaintiff's termination.  Defendant meets this burden by claiming that it terminated Plaintiff because he failed to comply with Defendant's Policy, and its repeated instructions, to complete a drug screen along with his workers' compensation claim.  Therefore, the burden shifts back to Plaintiff to demonstrate by clear and convincing evidence that Defendant's proffered reason for termination is pretextual.

### C.      Pretext

Pretext may be shown by demonstrating "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Defendant's proffered legitimate reasons for its termination

---

[50] *Rebarchek*, 35 P.3d at 899 (citing *Marinhagen v. Boster, Inc*., 840 P.2d 534 (Kan. Ct. App. 1992)).

[51] *Id.* (citing *Anderson v. Coors Brewing Co*., 181 F.3d 1171, 1179 (10th Cir.1999)).

[52] Even if the Court considers the beginning point as the date of the first injury on July 24, 2021, as Defendant urges, Plaintiff still meets his prima facie burden of demonstrating a causal connection based on temporal proximity alone.  *See Hill v. Kansas*, 448 P.3d 457, 475–76 (Kan. 2019) ("When the proximity between the protected action and the alleged retaliation is 'very close,' timing alone can be sufficient to make out a prima facie causation case; otherwise, the plaintiff must come forward with additional evidence to establish causal connection. . . .  Even a gap of four to six weeks has been held close enough to raise the inference.").

decision.[53]  Pretext can also be demonstrated by "direct evidence that the proffered rationale is false, or that the plaintiff was treated differently from similarly-situated employees."[54]  "The critical question regarding this aspect of the *McDonnell Douglas* rubric is whether 'a reasonable factfinder could rationally find [the employer's rationale] unworthy of credence and hence infer that the employer did not act for the asserted [non-retaliatory] reasons.'"[55]  The Court examines "the facts as they appear *to the person making the decision*"[56] and considers whether the decisionmaker "honestly believed those reasons and acted in good faith upon those beliefs."[57]

Plaintiff asks the Court to consider the following evidence of pretext: (1) temporal proximity between his workers' compensation claims and his termination; (2) Defendant's false and inconsistent reasons provided for his termination; (3) that Defendant acted contrary to its written policies and procedures; and (4) hostility toward him by his supervisors after he filed his claim.  As already discussed, Plaintiff has demonstrated extremely close temporal proximity between his worker's compensation claims and his termination.  Although the Court may consider this temporal proximity in analyzing pretext, "temporal proximity alone is insufficient to raise a genuine issue of material fact concerning pretext."[58]  The Court finds that other evidence in the summary judgment record, when considered along with this close temporal proximity, raises a genuine issue of material fact about pretext.

---

[53] *Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 714 (10th Cir. 2014) (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).

[54] *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1196 (10th Cir. 2011) (citing *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007)).

[55] *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1234 (10th Cir. 2015) (alterations in original) (quoting *Crowe*, 649 F.3d at 1196).

[56] *Zamora v. Elite Logistics, Inc.*, 478 F.3d 1160, 1166 (10th Cir. 2007) (en banc) (quoting *Watts v. City of Norman*, 270 F.3d 1288, 1295 (10th Cir. 2001)).

[57] *Young v. Dillon Cos.*, 468 F.3d 1243, 1250 (10th Cir. 2006) (quoting *Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 924–25 (10th Cir.2004)).

[58] *Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1213 (10th Cir. 2007) (citations omitted).

First, Plaintiff offers evidence that Defendant's handling of Plaintiff's work-related injuries was contrary to company policy in several ways, and delayed by weeks. Notably, Plaintiff attempted to report his initial injury to his supervisors on a daily basis starting on the day it happened, but his managers failed to take any action for over one month. They told him they were either too busy or referred him to another manager, who would then refer him back to the first. Making matters worse, his attempt to figure out how to file an incident report by reaching out to Allen went unanswered because his email went to her spam folder. Finally, after Plaintiff was reinjured and reached out to Allen a second time, the claims process was initiated. This several-week delay violated the Policy that requires a member of the management team to "immediately" report the injury to Defendant's third-party claims administrator. This is also inconsistent with and contradictory to Defendant's decision to impose a tight deadline on Plaintiff's drug screen requirement once he was provided with the paperwork he needed.

Defendant contends that the company's Policy requires a drug test whenever a team member seeks medical treatment due to a work-related injury, and that its form makes this clear. But these facts are disputed. It is true that the "Authorization for Examination or Treatment Form" states that "TEAM MEMBERS RECEIVING MEDICAL TREATMENT FOR A WORK-RELATED INJURY OR ILLNESS ARE REQUIRED TO HAVE SUBSTANCE ABUSE TESTING COMPLETED."[59] But Plaintiff points to a conflict between this directive and its Substance Abuse Policy. Under the Substance Abuse Policy, a drug screen is required for a work-related "accident," but only "may" be required for a work-related "injury."[60]

---

[59] Doc. 51-6 at 2.

[60] Doc. 57-3 at 1.

More importantly, it is controverted whether Plaintiff received this form that included the drug testing directive.  According to Plaintiff, when he collected the forms from McClain on August 31, he only received one piece of paper with a list of providers, and McClain wrote a number on the page.  McClain did not instruct Plaintiff to submit to a drug test when he sought medical treatment.  He told Plaintiff he could go to one of two locations for medical care. Plaintiff opted to go to Olathe Medical Center.  There are no facts to suggest he understood he was supposed to procure a drug screen at the time he received medical care at Olathe Medical Center or any other location.

Additionally, even when Plaintiff learned that there was a drug testing requirement, neither the form, nor the company policies provided him with information about how to procure a drug screen, or a deadline for completing it.  There is a genuine issue of material fact about whether Plaintiff received the deadline information from anyone before September 3.  While it is uncontroverted that Allen left Plaintiff a voicemail about the drug test deadline, she did not personally speak to Plaintiff about it, and Plaintiff denies receiving or hearing the voicemail. There is evidence that Plaintiff was generally aware of Defendant's drug test requirement by August 31, but it is controverted whether Plaintiff understood at that time that he must complete the drug screen by a certain deadline.  Plaintiff denies receiving the deadline information, and as discussed earlier in this Memorandum and Order, his declaration is not "self-serving" simply because it differs from Defendant's evidence.[61]  It is unconverted that as soon as Plaintiff was informed by Maier about the deadline on September 3, he obtained the drug screen and produced it to the store within a few hours.  A reasonable jury could conclude that Plaintiff was unaware of

---

[61] Defendant does not attempt to show that Plaintiff submitted a "sham affidavit" that contradicted his deposition testimony.

this noon deadline until September 3, and that neither Curry, nor McNeil, nor Allen reasonably ensured that it was communicated to him and that he was provided with the information he needed to comply with it.

Defendant urges the Court to view the facts as they appear to Allen, the final decisionmaker.  But Allen testified during her deposition that an "employee's supervisors are always the final decision makers in separation and HR provides guidance at Academy."[62] Although it may be true that the Allen was under the impression that Plaintiff had been provided with several directives other than her voicemail to receive a drug screen, she did not ensure that the September 3 deadline was conveyed to him, and he disputes whether his supervisors were truthful when they said they gave him the forms and oral guidance to complete a drug screen at the time he received medical treatment.

Defendant proffers evidence that other employees have reported work-related injuries and have not been terminated.  But Plaintiff has presented evidence upon which a reasonable jury could conclude that Defendant harbored a retaliatory animus against him notwithstanding these other cases.  In addition to the contradictions, inconsistencies, and implausibilities cited above, there is evidence that Plaintiff's supervisors repeatedly refused to report his original injury and then engaged in a pattern of retaliatory behavior: Maier reprimanded Plaintiff for his injury-related absences after his second injury even though Hernandez told him to take two days off, and Tatum called him within hours of him finally procuring the paperwork to seek medical attention and berated him for not returning the paperwork sooner, despite the fact that he completed medical treatment only ten minutes before the store closed.  Then, Allen and Curry imposed a tight timeframe on his drug screen requirement (which took place weeks after his

---

[62] Doc. 57-17 at 26:1–3.

original injury and, thus, by definition would not demonstrate whether he was under the influence when it happened), that was not mandated by the company's Policy.

In sum, Plaintiff has met his summary judgment burden of producing clear and convincing evidence that creates a genuine issue of material fact about whether Defendant's reason for his termination is unworthy of belief.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant's Motion for Summary Judgment (Doc. 50) is **denied**.  The Court will be in contact with the parties soon to schedule a pretrial conference and discuss a firm trial setting.

**IT IS SO ORDERED.**

Dated: June 2, 2023

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE